IN THE MATTER OF: RONALD WATSON

No. COA10-365

(Filed 15 February 2011)

## 1. Appeal and Error— mootness—involuntary commitment order

The validity of an involuntary commitment order was not moot on appeal even though the commitment term had passed because the order could result in collateral legal consequences.

## 2. Mental Illness— involuntary commitment hearing—waiver of counsel

Respondent's waiver of counsel at an involuntary commitment hearing was ineffective, and the resulting commitment order was vacated, where the trial court did not comply with the statutory mandates of N.C.G.S. § 15A-1242, N.C.G.S. § 122C-168(d), and IDS Rule 1.6. There was nothing in the record indicating that the trial court conducted a thorough inquiry that showed that defendant was literate and competent, the facts should have caused the trial court to question whether to preclude self-representation for respondent, and there was nothing in the record to indicate a thorough inquiry that showed that respondent understood and appreciated the consequences of his decision, the nature of the proceedings, and the commitment he was facing.

Appeal by respondent from order entered 1 August 2008 by Judge James T. Hill in Durham County District Court. Heard in the Court of Appeals 29 September 2010.

**IN RE WATSON**

[209 N.C. App. 507 (2011)]

*Attorney General Roy Cooper, by Assistant Attorney General Susannah B. Cox, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Kristen L. Todd, for respondent-appellant.*

CALABRIA, Judge.

Ronald Watson ("respondent") appeals an involuntary commitment order requiring him to be committed to Central Regional Hospital ("Central") for inpatient treatment for a period of thirty days, to be followed by outpatient treatment for sixty days. Respondent argues that the trial court erred by allowing him to represent himself at the involuntary commitment hearing or, in the alternative, the trial court erred by failing to conduct the statutorily required inquiry necessary to assure that his waiver of his constitutional right to counsel was knowing, intelligent and voluntary. We agree and vacate the trial court's order and remand this matter to the trial court for a new hearing.

## I. BACKGROUND

On 22 July 2008, Dr. Seth Glickman ("Dr. Glickman") of Duke University Health System ("Duke") filed an Affidavit and Petition for an involuntary commitment. Specifically, Dr. Glickman requested a court order for a law enforcement officer to take respondent into custody for examination, alleging that respondent was mentally ill and dangerous to himself or others or mentally ill and in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness. Dr. Glickman examined respondent after Dr. Matthew Conner had assessed respondent and noted that respondent had been pacing and refused medication. Dr. Glickman found the following pertinent facts:

> [Respondent] . . . was brought . . . by police secondary to reported agitation and violence at the home of his parents where he lives. At this time, patient is grossly psychotic with significant paranoia. He requires inpatient psychiatric hospitalization and stabilization.

Dr. Glickman recommended a three day inpatient commitment at Central to determine whether respondent was mentally ill and

dangerous to himself or others. That same day, in Durham County District Court, the court filed a "Findings and Custody Order: Involuntary Commitment," finding that there were reasonable grounds to believe that the facts alleged in the petition were true and that respondent was probably mentally ill and dangerous to himself or others or mentally ill and in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness. The court ordered law enforcement officers to transport respondent directly to Central for temporary custody, examination and treatment pending a district court hearing.

At 10:00 a.m. on 22 July 2008, respondent was examined by Dr. David Novosad ("Dr. Novosad"), a psychiatric resident at Central. As a result of the examination, Dr. Novosad concluded that respondent was mentally ill and dangerous to himself and others. In his report, Dr. Novosad stated that respondent had "significant paranoia," that respondent's "current mental status or the nature of his illness limits or negates his/her ability to make an informed decision to seek treatment voluntarily or comply with recommended treatment," and that respondent "believes the legal system is 'out to get him.' " Dr. Novosad diagnosed respondent with "psychosis NOS"[1] and recommended a thirty-day inpatient commitment and sixty-day outpatient commitment.

On 1 August 2008, a hearing was scheduled in Durham County District Court. Prior to the hearing, respondent asked the trial court who would serve as his court-appointed counsel. The trial court replied, "That guy right there." Respondent stated that he had not been introduced to counsel and the trial court granted respondent five minutes to meet with him. After speaking with respondent, counsel told the trial court, "He wants to represent himself[,]" and "wants me to just assist him." Counsel told the court that he advised respondent against proceeding *pro se*, but stated, "if you don't mind, I'll stand in for him." The trial court responded, "All right. Go ahead." The trial court then proceeded with the hearing without further discussion.

At the hearing, Dr. Novosad testified as an expert in mental health and psychosis. Dr. Novosad stated that he examined respondent on 21 July 2008. Dr. Novosad also testified that respondent lives with his parents and has lived with them for the past forty-eight years of his life. He became upset with his brother who was visiting and kicked a

---

1. "NOS" stands for "Not Otherwise Specified."

wall at his parents' home. Prior to this incident, respondent had never been treated for any kind of psychotic disorder. According to Dr. Novosad, respondent: (1) had "been increasingly involved with the legal system;" (2) reported that "he's been suffering some legal injustices;" (3) was concerned that he was being "mistreated;" (4) had become "more aggressive at home;" and (5) used marijuana "on a regular basis." Dr. Novosad concluded that respondent has "significant" paranoia and "psychotic disorder not otherwise specified," with a possibility that respondent suffers from schizophrenia.

While respondent was in Dr. Novosad's care, respondent received the medication Haloperidol, an antipsychotic medication commonly used for patients with psychotic disorder. Since respondent refused to take the medication orally, Dr. Novosad concluded that, based on respondent's condition, respondent required the use of forced medication. Dr. Novosad reported that while respondent was on the medication, he was "behaviorally appropriate . . . [and did] not cause[] any disturbances on the ward," and was "compliant with the ward routine" other than taking his medication orally. Dr. Novosad stated that if respondent complied by taking his medication orally, it would be appropriate to discharge him from the hospital.

Dr. Novosad further stated that he was concerned for respondent because respondent denied having a psychiatric problem and needing medication, and would not take his medication orally if discharged from the hospital. Dr. Novosad explained the risks, if respondent would not take his medication orally: "[t]he paranoia and the aggressive behavior at home would . . . worsen, and he would be a . . . risk of danger to . . . himself or others." Dr. Novosad recommended a thirty-day commitment for inpatient care with a sixty-day outpatient mental health commitment to address the issue of respondent's psychotic disorder and medication compliance. Dr. Novosad concluded that respondent needed inpatient commitment because "outside the hospital, there's no way that we could monitor whether he takes his medication . . . ."

Following respondent's cross-examination, respondent attempted to testify. During respondent's oath to tell the truth, respondent interrupted the court twice and ordered the trial court to "redo" the oath. Respondent then testified that his brother visited the home two weeks ago and they argued about turning down the music.

**IN RE WATSON**

[209 N.C. App. 507 (2011)]

Respondent claimed that he had "just done six-and-a-half months in Durham County Jail for failure to be notified, not failure to appear, as was claimed." He also claimed that courthouse officers beat him, broke his ribs, and slammed his head on the floor. Therefore, he was "going to sue" Durham County for "brutality" and "false arrest." Respondent said he was "stressed out" because "Durham County Court is corrupt." Respondent stated that during his prior court appearances, "I was in there representing myself. I had assistant counsel, just like I do today." Respondent added, "I do not want this case dismissed because I was trying to save a woman's life . . . a convicted felon for . . . conspiring to traffic cocaine. She's a junkie now, and she asked for my assistance to get off of it." Respondent claimed that after eight months of trying to help this woman, that he "got death threats through gunshots around my house."

Respondent further stated that every evening since he was in the hospital, he was forced to receive injections "through a . . . long needle in the butt," that he was "in pain every day, . . . and all I got is a doctor that wants to keep me in—keep himself in business by keeping me in—in a—in a hospital." He claimed he was "completely sane" and that he was "threatened by the doctors at Duke University . . . to either give a blood and urine sample or that [he] would be restrained . . . shot with a narcotic and . . . a . . . catheter stuck up [his] penis . . . ." Respondent asked the court to "be set free . . . and if you don't set me free, I would rather be in jail then [sic] in a hospital that forces medication on me."

The trial court found that respondent was represented by counsel, and found by clear, cogent and convincing evidence that respondent was "grossly psychotic with significant paranoia, has exhibited aggressive behavior at home to parents [and] brother, has kicked hole in wall at home, [and] has refused meds." Based on these findings, the trial court concluded that respondent was mentally ill and a danger to himself and others. The trial court ordered respondent committed for thirty days of inpatient care at Central, to be followed by sixty days of outpatient care.

Respondent then asked the trial court if the time period of inpatient commitment was three days. When the trial court responded that the period was thirty days, respondent stated, "F[] this court!" ten times then added, "I'm not violent!" as he was carried out of the courtroom.

On 29 August 2008, respondent filed a written notice of appeal, but did so in the wrong court. On 14 October 2009, respondent petitioned this Court for writ of *certiorari*, and we granted respondent's petition on 28 October 2009. On 16 December 2009, the trial court entered an order finding respondent indigent and appointing the Office of the Appellate Defender to represent respondent.

## II. STANDARD OF REVIEW

On appeal of a commitment order[,] our function is to determine whether there was any competent evidence to support the "facts" recorded in the commitment order and whether the trial court's ultimate findings of mental illness and dangerous[ness] to self or others were supported by the "facts" recorded in the order. *In re Underwood*, 38 N.C. App. 344, 347-48, 247 S.E.2d 778, 781 (1978); *In re Hogan*, 32 N.C. App. 429, 433, 232 S.E.2d 492, 494 (1977). We do not consider whether the evidence of respondent's mental illness and dangerousness was clear, cogent and convincing. It is for the trier of fact to determine whether the competent evidence offered in a particular case met the burden of proof. *In re Underwood*, *supra*, at 347, 247 S.E.2d at 781.

*In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980) (italics omitted).

## III. INITIAL MATTER—MOOTNESS

**[1]** As an initial matter, we address whether respondent's appeal is moot.

Usually, when the terms of a challenged trial court judgment have been carried out, a pending appeal of that judgment is moot because an appellate court decision "cannot have any practical effect on the existing controversy." *Roberts v. Madison Cty. Realtors Ass'n, Inc.*, 344 N.C. 394, 398-99, 474 S.E.2d 783, 787 (1996). In certain cases, however, the continued existence of the judgment itself may result in collateral legal consequences for the appellant. *See, e.g., In re Hatley*, 291 N.C. 693, 694-95, 231 S.E.2d 633, 634-35 (1977) (involuntary commitment order); *Smith ex rel. Smith v. Smith*, 145 N.C App. 434, 436-37, 549 S.E.2d 912, 913-14 (2001) (domestic violence protective order). Possible adverse consequences flowing from a judgment preserve an appellant's substantial stake in the outcome of the case and the validity of the challenged judgment continues to be a "live" controversy. As a result, an appeal from a judgment which creates possible

collateral legal consequences for the appellant is not moot. *Hatley*, 291 N.C. at 694, 231 S.E.2d at 634.

*In re A.K.*, 360 N.C. 449, 452-53, 628 S.E.2d 753, 755 (2006).

In the instant case, respondent was committed on 1 August 2008 to an inpatient facility for thirty days followed by sixty days of out-patient care. Respondent's appeal was heard by this Court on 29 September 2010. However, since the trial court's order may result in collateral legal consequences for respondent, the validity of the challenged order continues to be a live controversy. Therefore, respondent's appeal is not moot.

## IV. WAIVER OF COUNSEL

[2] Respondent argues that the trial court erred by allowing him to represent himself at the district court hearing because the commitment statutes do not allow a respondent facing inpatient involuntary commitment to represent himself, or in the alternative, that the trial court erred by (1) not making the required findings that he was acting with full awareness of his rights and the consequences of his waiver, (2) not inquiring into his mental condition or the complexity of the matter before allowing him to waive his right to counsel, and (3) not acquiring such waiver of counsel in writing. We agree.

N.C. Gen. Stat. § 122C-268 (2008), which governs inpatient commitments, states in pertinent part:

> The respondent *shall* be represented by counsel of his choice; or if he is indigent within the meaning of G.S. 7A-450 or refuses to retain counsel if financially able to do so, he *shall* be represented by counsel appointed in accordance with rules adopted by the Office of Indigent Defense Services.

N.C. Gen. Stat. § 122C-268(d) (emphases added).

"This Court has held that use of the language 'shall' is a mandate to trial judges, and that failure to comply with the statutory mandate is reversible error." *In re Eades*, 143 N.C. App. 712, 713, 547 S.E.2d 146, 147 (2001). "Where the language of a statute is clear, the courts must give the statute its plain meaning[.]" *Martin v. N.C. Dep't of Health & Human Servs.*, 194 N.C. App. 716, 719, 670 S.E.2d 629, 632 (2009).

The language of N.C. Gen. Stat. § 122C-268(d) is clear. A person facing involuntary commitment must be represented by counsel of

his choice, and if he is indigent, he must be represented by counsel appointed in accordance with the rules adopted by the Office of Indigent Defense Services ("IDS Rules").

Rule 1.6 of the IDS Rules, titled "Waiver of Counsel," states:

An indigent person who has been informed of his or her right to be represented by counsel at any in-court-proceeding may, in writing, waive the right to in-court representation by counsel. Any such waiver of counsel *shall* be effective *only if* the court finds of record that at the time of waiver the indigent person acted with full awareness of his or her rights and of the consequences of the waiver. In making such a finding, the court *shall* follow the requirements of G.S. 15A-1242 and *shall* consider, among other things, such matters as the person's age, education, familiarity with the English language, mental condition, and the complexity of the matter.

IDS Rule 1.6 (2008) (emphases added).

N.C. Gen. Stat. § 15A-1242 (2008) states:

A defendant may be permitted at his election to proceed in the trial of his case without the assistance of counsel only after the trial judge makes thorough inquiry and is satisfied that the defendant: (1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled; (2) Understands and appreciates the consequences of this decision; and (3) Comprehends the nature of the charges and proceedings and the range of permissible punishments.

N.C. Gen. Stat. § 15A-1242 (2008).

While our courts have previously held that the protections afforded by N.C. Gen. Stat. § 15A-1242 are mandatory in the context of criminal proceedings, *State v. Pruitt*, 322 N.C. 600, 369 S.E.2d 590 (1988), we have not addressed whether they are mandatory in the context of involuntary commitment proceedings. "Although a civil commitment proceeding cannot be equated to a criminal prosecution, the standards in criminal cases have been examined to determine when waiver [of counsel] can occur." *In re Jesse M.*, 217 Ariz. 74, 78, 170 P.3d 683, 687 (2007) (internal quotations and citations omitted); *see also Matter of S.Y.*, 162 Wis.2d 320, 469 N.W.2d 836 (1991).[2]

---

2. We note that the commentary to IDS Rule 1.6 implies "that in some circumstances a person may lack the capacity to waive counsel. For example, N.C. Gen. Stat.

Our Supreme Court has held that in criminal cases, " '[b]efore allowing a defendant to waive in-court representation by counsel . . . the trial court must insure that constitutional and statutory standards are satisfied.' " *State v. Moore*, 362 N.C. 319, 322, 661 S.E.2d 722, 724 (2008) (quoting *State v. Thomas*, 331 N.C. 671, 673, 417 S.E.2d 473, 475 (1992)). "Once a defendant clearly and unequivocally states that he wants to proceed *pro se*, the trial court . . . must determine whether the defendant knowingly, intelligently, and voluntarily waives the right to in-court representation by counsel." *Thomas*, 331 N.C. at 674, 417 S.E.2d at 476 (citations omitted). "[T]he record must show that the defendant was literate and competent, that he understood the consequences of his waiver, and that, in waiving his right, he was voluntarily exercising his own free will." *State v. Thacker*, 301 N.C. 348, 354, 271 S.E.2d 252, 256 (1980).

In order to determine whether the defendant's waiver meets this constitutional standard, the trial court must conduct a thorough inquiry, and perfunctory questioning is not sufficient. *Thomas*, 331 N.C. at 674, 417 S.E.2d at 476. "A trial court's inquiry will satisfy this constitutional requirement if conducted pursuant to N.C.G.S. § 15A-1242." *Moore*, 362 N.C. at 322, 661 S.E.2d at 724 (citation omitted). The trial court's inquiry under N.C. Gen. Stat. § 15A-1242 "is mandatory and failure to conduct such an inquiry is prejudicial error." *Pruitt*, 322 N.C. at 603, 369 S.E.2d at 592.

"[T]he United States Constitution permits judges to preclude self-representation for defendants adjudged to be 'borderline-competent' based on a 'realistic account of the particular defendant's mental capacities . . . .' " *State v. Lane*, 362 N.C. 667, 668, 669 S.E.2d 321, 322 (2008) (quoting *Indiana v. Edwards*, 554 U.S. 164, ——, 128 S. Ct. 2379, 2387-88, 171 L. Ed. 2d 345, 357 (2008)), *clarified*, 363 N.C. 121, ——, —— S.E.2d ——, *and motion granted*, —— N.C. ——, 685 S.E.2d 514 (2009), *motion denied*, 364 N.C. 329, 701 S.E.2d 245 (2010). Furthermore, "[i]t is the trial court's duty to conduct the inquiry of defendant to ensure that defendant understands the consequences of his decision." *Pruitt*, 322 N.C. at 604, 369 S.E.2d at 593.

---

§ 122C-268(d) provides that in cases in which a person is alleged to be mentally ill and subject to in-patient commitment, counsel shall be appointed if the person is indigent or refuses to retain counsel although financially able to do so." IDS Rule 1.6, Commentary. Other jurisdictions prohibit a respondent from proceeding *pro se* at an involuntary commitment proceeding. *See In re L.K.*, 353 Mont. 246, 249, 219 P.3d 1263, 1265 (2009); *In re Penelope W.*, 977 A.2d 380, 382 (Me. 2009).

Moreover, " 'neither the statutory responsibilities of standby counsel, N.C.G.S. § 15A-1243, nor the actual participation of standby counsel . . . is a satisfactory substitute for the right to counsel in the absence of a knowing and voluntary waiver.' " *Pruitt*, 322 N.C. at 603, 369 S.E.2d at 592 (quoting *State v. Dunlap*, 318 N.C. 384, 389, 348 S.E.2d 801, 805 (1986)).

While the above-stated cases are criminal cases and not cases of involuntary commitment, we hold that the protections afforded by N.C. Gen. Stat. § 15A-1242, N.C. Gen. Stat. § 122C-268(d), and IDS Rule 1.6 are mandatory in involuntary commitment proceedings and that the rationale from the above-cited cases also applies to cases of involuntary commitment.

> Where, as in both proceedings for juveniles and mentally deficient persons, the state undertakes to act in *parens patriae*, it has the inescapable duty to vouchsafe due process, and this necessarily includes the duty to see that a subject of an involuntary commitment proceedings is afforded the opportunity to the guiding hand of legal counsel at every step of the proceedings, unless effectively waived by one authorized to act in his behalf.

*Heryford v. Parker*, 396 F.2d 393, 396 (10th Cir. 1968); *Johnson v. Solomon*, 484 F. Supp. 278, 286 (D. Md. 1979); *Towne v. Hubbard*, 3 P.3d 154, 159 n.18 (Okla. 2000); *Honor v. Yamuchi*, 307 Ark. 324, 329, 820 S.W.2d 267, 270 (1991); *Perry v. Banks*, 521 S.W.2d 549, 554 (Tenn. 1975); *In re Fisher*, 39 Ohio St. 2d 71, 77, 313 N.E.2d 851, 855-56 (1974). *See also In re Det. of J.S.*, 138 Wn. App. 882, 895, 159 P.3d 435, 442 (2007); *In Interest of R.Z.*, 415 N.W.2d 486, 488 (N.D. 1987); *State v. Collman*, 9 Ore. App. 476, 483, 497 P.2d 1233, 1236 (1972); Brunetti, *The Right to Counsel, Waiver Thereof, and Effective Assistance of Counsel in Civil Commitment Proceedings*, 29 S.W.L.J. 684, 711-12 (1975).

In the instant case, just prior to the hearing, the trial court engaged in the following colloquy with respondent:

[Respondent]: Uh, excuse me; uh . . . I - I want to - to know who's - who's s - supposedly representing me.

The Court: That guy right there.

Unknown: Raise your right ha- -

[Respondent]: Well, I haven't even been *introduced* to him yet. (background) Can't - can't I even speak to him before a trial starts?"

**IN RE WATSON**

[209 N.C. App. 507 (2011)]

Subsequently, the trial court engaged in the following conversation with respondent's appointed counsel:

The Court: Do you want a couple of minutes? (background)

The Court: *(louder)* Do you want a couple of minutes, Mr. Perry?

Mr. Perry: Just five minutes.

The Court: That's fi-, that's fine. That'll be fine! You can come down. You-you're sworn in, but you can be at ease. We're going to pause for-for a few minutes. That's fine.

(pause)

(background)

The Court: All right. Let's get started. Now, you've got the doctor, he's been sworn in (INAUDIBLE) or?

Mr. Perry: Your Honor, uh, my client wants me to just assist him. He wants to represent himself. But, if you don't mind, I will - I advised him against it, but if you don't mind, I'll stand in for him.

The Court: All right. Go ahead.

Mr. Perry: All right. Thank you.

The Court: He'll be sitting there, but go ahead and —

There is nothing in the record indicating that the trial court conducted a thorough inquiry that showed that respondent was literate. In addition, there is nothing in the record indicating that the trial court conducted a thorough inquiry that showed that respondent was competent. The trial court's determinations of competency to waive counsel may be "based on observation of the defendant *during the proceedings.*" *United States v. Vamos,* 797 F.2d 1146, 1150 (2d Cir. 1986) (emphasis added).

At the hearing in the instant case, the trial court had before it the Affidavit and Petition for Involuntary Commitment, which stated that respondent was "mentally ill and dangerous to himself or others or mentally ill and in need of treatment in order to prevent future disability or deterioration that would predictably result in dangerousness." The Affidavit and Petition also stated that respondent was "grossly psychotic with significant paranoia" and required "inpatient psychiatric hospitalization and stabilization."

During the hearing, Dr. Novosad testified that respondent was refusing his medication and that if respondent did not comply by taking his medication, his paranoia and aggressive behavior would worsen, and he would be a risk of danger to himself or others. While respondent was initially sworn in without incident regarding whether he had an opportunity to meet his court-appointed counsel, in his subsequent swearing-in prior to his testimony, respondent engaged in a belligerent exchange with the trial court over his oath, and ordered the trial court to "redo it." After respondent was sworn in for the second time, he delivered his testimony in a rambling narrative, accusing the court of being corrupt and law enforcement officers of police brutality, claiming to have received death threats and gunshots at his home because he was helping a woman get off drugs, and alleging he was threatened by hospital doctors. At the conclusion of the hearing, the trial court concluded that respondent was mentally ill and was dangerous to himself and others, and ordered him committed to Central for thirty days of inpatient care.

While the trial court was in the best position to determine respondent's capacity to waive counsel, these facts should have caused the trial court to question whether to preclude self-representation for respondent in this case based on a realistic account of his mental capacities. *Lane*, 362 N.C. at 668, 669 S.E.2d at 322.

Additionally, there is nothing in the record indicating that the trial court conducted a thorough inquiry that showed that respondent understood and appreciated the consequences of his decision or comprehended the nature of the proceedings and the length or type of commitment he was facing. *See Dunlap*, 318 N.C. at 389, 348 S.E.2d at 804; *see also Eckroth v. B.L.S.*, 721 N.W.2d 50, 53 (N.D. 2006) ("[I]n order to establish a proper waiver of counsel in a mental health proceeding, the district court must engage in a colloquy on the record, which must mirror the record in a waiver of counsel in the criminal context. Absent such evidence on the record, a respondent in an involuntary commitment proceeding cannot represent himself.") (internal citations omitted).

The trial court did not make sure respondent was acting with full awareness of his rights, nor did it conduct a thorough inquiry as required by N.C. Gen. Stat. § 15A-1242. The trial court did not ask or consider respondent's age, education, mental condition, or the complexity of the proceeding. During the colloquy with the trial court, respondent's appointed counsel, not respondent, stated that respon-

dent "wants to represent himself," even though counsel "advised him against it." This is insufficient to show compliance with N.C. Gen. Stat. § 15A-1242. *See Moore*, 362 N.C. at 322, 661 S.E.2d at 724 (suggesting that it is error for the trial court to "defer[] to defendant's assigned counsel to provide defendant with adequate constitutional safeguards" rather than conduct "the appropriate inquiry mandated by N.C.G.S. § 15A-1242"); *accord Pruitt*, 322 N.C. at 604, 369 S.E.2d at 593 ("Having a bench conference with counsel is insufficient to satisfy the mandate of [N.C. Gen. Stat. § 15A-1242].").

The State argues that respondent "had the assistance of counsel at [the] hearing" as required by N.C. Gen. Stat. § 122C-268(d). We disagree.

In the involuntary commitment order, the trial court found that respondent was represented by counsel. However, there is no competent evidence in the record to support this finding. Mr. Perry clearly notified the court that while he advised respondent against proceeding *pro se*, he would "stand in for him." The trial court then responded, "All right. Go ahead." We reiterate that " 'neither the statutory responsibilities of standby counsel, N.C.G.S. § 15A-1243, nor the actual participation of standby counsel . . . is a satisfactory substitute for the right to counsel in the absence of a knowing and voluntary waiver.' " *Pruitt*, 322 N.C. at 603, 369 S.E.2d at 592 (quoting *State v. Dunlap*, 318 N.C. 384, 389, 348 S.E.2d 801, 805 (1986)).

Furthermore, the trial court's instruction to respondent that his appointed counsel would "be sitting there" is not sufficient to satisfy the statutory mandate that the court must make a "thorough inquiry" to satisfy itself that the defendant "comprehends the nature of the charges and proceedings and the range of permissible punishments." N.C. Gen. Stat. § 15A-1242. Moreover, respondent did not execute a written waiver as required by the IDS Rules. Therefore, the trial court's finding that respondent was represented by counsel is not supported by any competent evidence, nor is there evidence that respondent or anyone authorized to act on his behalf effectively waived respondent's right to counsel.

Because the trial court failed to comply with the statutory mandates of N.C. Gen. Stat. § 15A-1242, N.C. Gen. Stat. § 122C-268(d) and IDS Rule 1.6, respondent's waiver of counsel was ineffective and the resulting commitment order must be vacated.

Although the trial court was not required to follow a specific "checklist" of questions when conducting its inquiry into respon-

dent's waiver of counsel, we hold that in future cases regarding the waiver of counsel in involuntary commitment proceedings, trial courts should note the language of our Supreme Court in *Moore*:

> Although not determinative in our decision, we take this opportunity to provide additional guidance to the trial courts of this State in their efforts to comply with the "thorough inquiry" mandated by N.C.G.S. § 15A-1242. The University of North Carolina at Chapel Hill School of Government has published a fourteen-question checklist "designed to satisfy requirements of" N.C.G.S. § 15A-1242:
>
> 1. Are you able to hear and understand me?
>
> 2. Are you now under the influence of any alcoholic beverages, drugs, narcotics, or other pills?
>
> 3. How old are you?
>
> 4. Have you completed high school? college? If not, what is the last grade you completed?
>
> 5. Do you know how to read? write?
>
> 6. Do you suffer from any mental handicap? physical handicap?
>
> 7. Do you understand that you have the right to be represented by a lawyer?
>
> 8. Do you understand that you may request that a lawyer be appointed for you if you are unable to hire a lawyer; and one will be appointed if you cannot afford to pay for one?
>
> 9. Do you understand that, if you decide to represent yourself, you must follow the same rules of evidence and procedure that a lawyer appearing in this court must follow?
>
> 10. Do you understand that, if you decide to represent yourself, the court will not give you legal advice concerning defenses, jury instructions or other legal issues that may be raised in the trial?
>
> 11. Do you understand that I must act as an impartial judge in this case, that I will not be able to offer you legal advice, and that I must treat you just as I would treat a lawyer?
>
> 12. Do you understand that you are charged with , and that if you are convicted of this (these) charge(s), you could be imprisoned for a maximum of and that the minimum sentence is ? (Add fine or restitution if necessary.)

**IN RE WATSON**

[209 N.C. App. 507 (2011)]

13. With all these things in mind, do you now wish to ask me any questions about what I have just said to you?

14. Do you now waive your right to assistance of a lawyer, and voluntarily and intelligently decide to represent yourself in this case?

*See* 1 Super. Court Subcomm., Bench Book Comm. & N.C. Conf. of Super. Court Judges, *North Carolina Trial Judge's Bench Book* § II, ch. 6, at 12-13 (Inst. of Gov't, Chapel Hill, N.C., 3d ed. 1999) (italics omitted). While these specific questions are in no way required to satisfy the statute, they do illustrate the sort of "thorough inquiry" envisioned by the General Assembly when this statute was enacted and could provide useful guidance for trial courts when discharging their responsibilities under N.C.G.S. § 15A-1242.

*Moore*, 362 N.C. at 327-28, 661 S.E.2d at 727. This Court also notes with approval the language in *Jesse M.*:

[W]hen the [trial] court is faced with a patient who wants to waive his right to counsel at an involuntary commitment hearing, the court should: (a) advise the patient of his right to counsel; (b) advise the patient of the consequences of waiving counsel, namely, that the patient and not the lawyer will be responsible for presenting his case, cross-examining the petitioner's witnesses, calling witnesses, and presenting evidence as well as closing argument; (c) seek to discover why the patient wants to represent himself, which may involve a dialogue with counsel or others; (d) learn whether the patient has any education, skill or training that may be important to deciding whether he has the competence to make the decision; (e) determine whether the patient has some rudimentary understanding of the proceedings and procedures to show he understands the right he is waiving; and (f) consider whether there are any other facts relevant to resolving the issue. Once that on-the-record discussion has been completed, the trial court should make specific factual findings supporting the grant or denial of the waiver.

217 Ariz. at 80, 170 P.3d at 689.

## V. CONCLUSION

"Because we dispose of this case on one assignment of error and because the other assigned errors may not arise at retrial, we need

not address them." *Pruitt*, 322 N.C. at 601, 369 S.E.2d at 591. The involuntary commitment order is vacated and this matter is remanded for a new hearing.

Vacated and remanded for new hearing.

Judges HUNTER, Robert C., and GEER concur.